IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

v.                                                   CRIMINAL NO. 3:22-CR-42-SA

HENRY WEAVER                                                        DEFENDANT

### ORDER AND MEMORANDUM OPINION

There are currently nine pending Motions in this case. The Court has held multiple hearings and received significant filings. Having taken all the submissions into account, the Court is prepared to rule.

*Factual and Procedural Background*

The facts of this case are lengthy and, to some extent, convoluted. However, a full explanation of the circumstances leading the Court to this point is necessary.

Henry Weaver was initially indicted on April 28, 2022. The original Indictment [1] contained only one Count and charged Weaver as follows:

**COUNT ONE**

> On or about April 23, 2022, in the Northern District of Mississippi, HENRY WEAVER aka "NATE DOGG", defendant, did knowingly and intentionally intimidate and interfere with one or more persons designated in 18 U.S.C. § 1114, that is, an officer or employee of the United States or any agency thereof, to wit, a mail carrier with the United States Postal Service, while said person was engaged in the performance of his official duties, and in doing so, used a deadly and dangerous weapon, all in violation of Title 18, United States Code, Sections 111(a)(1) and 111(b).

[1] at p. 1.

A Superseding Indictment [19] (which is now the operative Indictment) was filed against Weaver on June 16, 2022. In addition to the Count listed above, the Superseding Indictment [19] includes a second Count:

**COUNT TWO**

> On or about January 12, 2022, in the Northern District of Mississippi, HENRY WEAVER aka "NATE DOGG", defendant, knowing that he had previously been convicted in a court of a felony, that is, a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, namely, a Charter Arms, model U.C. Lite, .38 Special caliber revolver, in and affecting interstate commerce, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

[19] at p. 1-2.

As the above quotations make clear, the charges are in reverse chronological order. Regarding Count One, the Government contends that Weaver threatened to kill Ben Jones, a United States Postal worker. The Government's theory as to that Count is that Weaver had not received a package containing drugs that he was expecting to receive via the mail. Weaver, according to the Government, threatened to kill Jones if he did not receive the package within a short period of time.

Count Two stems from a traffic stop that occurred in Batesville, Mississippi. On the night in question, Weaver was traveling east on Highway 6 through Batesville in a black 2004 Dodge Avenger. At the time, Officer Nathan Hollings was a patrol officer with the Batesville Police Department. Officer Hollings was parked on the south side of Highway 6 observing traffic. Officer Hollings contends that Weaver's tag light was not operational when Weaver passed him, and he therefore pulled out and began to follow Weaver. Ultimately, Officer Hollings turned on his blue lights and initiated a traffic stop on Weaver's vehicle. Weaver complied and pulled over on a side street. Sergeant Jonathan Dutton, who at the time worked with Batesville Police Department, arrived on the scene shortly after the stop was initiated.

A couple minutes after the commencement of the stop, the Officers apparently asked Weaver to exit the vehicle. He complied and remained standing behind the vehicle for a period of

time. However, he ultimately fled the scene on foot. The Officers chased him and ultimately caught him in a nearby wooded area. Weaver had a firearm in his pants, and the Officers also located drugs in Weaver's vehicle and in the area where he had fled. Because Weaver had previously been convicted of a felony, he was charged with knowing possession of a firearm as a convicted felon in violation of Section 922(g)(1).

The case ultimately proceeded to trial. On December 7, 2022—the day before trial—the Court held a suppression hearing. That hearing concerned the validity of the traffic stop that led to the Section 922(g)(1) charge. In his written Motion to Suppress [40] and at that hearing, Weaver took the position that his tag light was actually operational at the time of the stop, that the traffic stop was not justified at the outset, and that the firearm should be suppressed as fruit of the poisonous tree.

At the suppression hearing, the Court reviewed dash cam video from Officer Hollings' vehicle.[1] The Court also heard testimony from Officer Hollings. Ultimately, at the conclusion of the hearing, the Court orally denied suppression. The Court provided the reasons for its conclusion at that time.

Weaver's trial commenced the next day. Following a two-day trial, a jury found Weaver guilty on both Counts. On December 23, 2022, Weaver filed a Motion for a New Trial [60]. The Court denied that request on January 11, 2023.

Weaver's sentencing was scheduled for April 4, 2023. On that day, prior to a sentence being imposed, Weaver raised issues associated with his counsel, Paul Chiniche, Esq., who had represented Weaver at trial and through the date of the scheduled sentencing. The Court ultimately permitted Chiniche to withdraw as counsel and authorized Weaver to proceed *pro se*. A few days

---

[1] For reasons that will become more apparently hereinafter, the Court notes that the dash cam video was played without sound at the suppression hearing.

later, Weaver requested appointment of standby counsel. The Court granted that request, and Thomas Levidiotis, Esq., was appointed as Weaver's standby counsel. Weaver, shortly thereafter, raised issues with Levidiotis and requested (again) that he be permitted to proceed *pro se*. The Court granted that request. Weaver then filed numerous *pro se* Motions, requesting substantial relief—spanning from disclosure of grand jury documents to dismissal of the charges against him.

Although some of Weaver's filings are unremarkable, one filing—his Motion for New Suppression Hearing [108]—is particularly noteworthy. In that Motion [108], Weaver emphasized that the dash cam video was played without sound at the original suppression hearing. Weaver urged the Court to review the video with sound. The Court did so.

In reviewing the thumb drive introduced at the suppression hearing that contained the dash cam video (G-1), the Court first noticed that there are actually two videos on the thumb drive. Although they are both videos of Officer Hollings' dash cam, one video is slightly longer than the other. The "long video" begins approximately nine seconds earlier than the "short video." At the time of the original suppression hearing, the Court was unaware that there were two different videos on the thumb drive. However, when reviewing Weaver's *pro se* filings and reviewing all of the evidence, the Court reviewed the "long video" with sound.

At the beginning of the "long video"—approximately one second into it—the words "go after him" can faintly be heard. Approximately sixteen seconds into the video, the words "tag lights" can be heard. This immediately gave the Court pause. A hearing was convened on August 1, 2023.

At the August 1, 2023 hearing, the Court explained to the parties—counsel for the Government and Weaver (who was *pro se* at the time)—its concerns. At that hearing, Weaver advised the Court that he never received the "long video" in discovery and indicated that he only

asked the Court to listen to the audio because of the "tag lights" words being uttered.[2] The Court advised the parties that it would set an additional hearing to carefully consider all evidence associated with the case (particularly Count Two), including the testimony of Officer Hollings. The Court also directed the Government to have available Sergeant Dutton and any other Officers who came to the scene on the night in question. In addition, the Court advised Weaver of its belief that he should be represented so that counsel could present his arguments to the Court. Weaver agreed, and the Court appointed Goodloe Lewis, Esq. to represent Weaver.

The Court held an additional hearing on December 13, 2023. The proof introduced at the December 13, 2023 hearing concerned only Count Two.[3] At that hearing, the Court heard testimony from Officer Hollings, Sergeant Dutton, and Sergeant J.P. Wallace.

Similar to the original suppression hearing, Officer Hollings testified regarding the circumstances surrounding the traffic stop. When specifically questioned about the audible statements on the dash cam video, Officer Hollings testified that he was on his personal cell phone (on speaker phone) with Sergeant Dutton prior to pulling his vehicle onto Highway 6 to follow Weaver. According to Officer Hollings, Sergeant Dutton said "go after him" and Sergeant Dutton said so in response to Officer Hollings' statement (prior to the commencement of the dash cam video) that Weaver appeared to be driving in a suspicious manner—more particularly, switching from the right lane (which was closest to Officer Hollings' vehicle) to the left lane and traveling slower than other traffic on Highway 6 that night. Officer Hollings testified that it was his own

---

[2] For context, and consistent with the time markers indicated above, the "short video" begins after the words "go after him" but before the words "tag lights." It appears that the "short video" is the version Weaver contends he received in discovery—it is the version attached to his *pro se* filings.

[3] The Court notes that Weaver did not concede his arguments concerning Count One; however, he agreed that there was no additional proof to be submitted and that the Court should decide the pertinent issues based on the parties' filings.

voice that said "tag lights" and that he said so because he was observing tag lights being out and that was the basis for the stop.

Both Sergeant Dutton and Officer Hollings testified that they were good friends and that it was not uncommon for them to be on the phone for several hours during their shift. In large part, Sergeant Dutton's testimony was consistent with Officer Hollings' testimony as to the circumstances surrounding the stop.

After the presentation of all proof, the Court heard argument from the parties and ultimately took the case under advisement. The Court is cognizant that the procedural posture of this case is unusual. However, considering the fact that it did not become aware of certain evidence until after the trial, the Court found it necessary to fully delve into the same so that no pertinent facts were left unconsidered.

*Analysis and Discussion*

As indicated above, Weaver has raised arguments associated with Count One—despite the fact that the proof submitted at the December 13, 2023 hearing concerned only Count Two. The Court will address Weaver's filings as to Count One after addressing Count Two and the evidence presented at the most recent hearing.

I.      *Count Two*

While Weaver has made several separate filings and requested various types of relief associated with Count Two, the Court finds it most appropriate to address his request for a new trial.

A.      *Standard*

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so

requires." FED. R. CRIM. P. 33(a). Unlike a motion for acquittal, "in a motion for new trial, the trial court may weigh the evidence and assess the credibility of the witnesses during its consideration of the motion[.]" *United States v. Young*, 547 F.Supp.3d 575, 583 (N.D. Tex. July 6, 2021) (citing *United States v. Fuchs*, 467 F.3d 889, 909 (5th Cir. 2006)).

In the Fifth Circuit, "it is generally accepted that a new trial ordinarily should not be granted unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict which has an adverse effect on the substantial rights of a defendant." *Id*. (citing *United States v. Wright*, 534 F.3d 770, 775 (5th Cir. 2011); *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004)). And "[a] defendant's substantial rights are violated if an error affects the outcome of the trial court proceedings." *Id*. (citing *United States v. Slayton*, 2019 WL 3892426, at *1 (S.D. Miss. Aug. 19, 2019)). Importantly, a district court maintains broad discretion in ruling on a motion for a new trial. *Fuchs*, 467 F.3d at 909.

### B.    Applicable Law and Application

"The Fourth Amendment protects individuals 'against unreasonable searches and seizures.'" *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting U.S. CONST. AMEND. IV). "Traffic stops are considered seizures within the meaning of the Fourth Amendment." *United States v. Valadez*, 267 F.3d 395, 397 (5th Cir. 2001) (citing *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000)).

"Generally, the party seeking suppression has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Webb*, 2022 WL 2232197, at *1 (N.D. Miss. June 21, 2022) (quoting *United States v. Beaudion*, 979 F.3d 1092, 1102 (5th Cir. 2020)). But where evidence has been

obtained through a warrantless search and seizure (as is the case here), "the government bears the burden of proving, by a preponderance of the evidence, that the search and seizure were constitutional." *Id*. (quoting *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012)).

"The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)." *Lopez-Moreno*, 420 F.3d at 430 (citing *Knowles v. Iowa*, 525 U.S. 113, 117, 119 S. Ct. 484, 142 L. Ed. 2d 492 (1998)) (additional citation omitted). The *Terry* standard is a "two-tiered reasonable suspicion inquiry: 1) whether the officer's action was justified at its inception, and 2) whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place." *Valadez*, 267 F.3d at 398 (5th Cir. 2001) (citations omitted).

Only the first *Terry* prong is at issue here. Under the first prong, "[f]or a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Lopez-Moreno*, 420 F.3d at 430 (citing *United States v. Breeland*, 53 F.3d 100, 102 (5th Cir. 1995)). In analyzing whether reasonable suspicion exists, "a court must look at the totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Id*. (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002); *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)) (internal quotation marks omitted). The Fifth Circuit has previously held that "reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id*. (citing *United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002)).

Importantly, "Supreme Court and Fifth Circuit precedent has made clear that an officer's subjective intentions have no impact on analyzing reasonable suspicion or probable cause because they are both considered to be based on an objective test." *Id*. at 432. In other words, "an officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment. . . So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment." *Id*. (citations omitted).

As previously indicated, Officer Hollings' articulated reason for the traffic stop was an inoperable tag light in violation of Mississippi law.[4] There are two main evidentiary bases to support the contention that Weaver's tag light was inoperable—Officer Hollings' dash cam video and Officer Hollings' testimony.

The Court will first address the dash cam video. In short, the Court finds it inconclusive. At many times throughout the video, Weaver's tag appears to be illuminated. The Government contends—and Officer Hollings testified—that the tag only looks illuminated because of the reflection from Officer Hollings' headlights. During both hearings, the Government pointed to certain parts of the dash cam video where the Government contends that the tag appears to be dark, indicating, in the Government's view, that there was not an operable tag light.

At the initial suppression hearing, the Court agreed with the Government and denied suppression. In its oral ruling, the Court walked through the video and pointed to those places of the video that the Government emphasized. The Court ultimately found that the Government had

---

[4] In pertinent part, the applicable statutory section provides: "Either a rear lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly readable from a distance of fifty (50) feet to the rear." MISS. CODE ANN. § 63-7-13(3).

shown by a preponderance of the evidence that the tag light was inoperable and, therefore, that suppression should be denied. In reaching that conclusion, because the video in and of itself did not clearly illustrate that the tag was not illuminated, the Court necessarily relied heavily on the testimony of Officer Hollings.

Fast forward to the December 13, 2023 hearing. On direct examination, Officer Hollings testified (for the first time) that he was engaged in a phone conversation with Sergeant Dutton in the moments leading up to the stop. Officer Hollings explained that he had previously advised Sergeant Dutton that he intended to take a break from being proactive. In essence, Officer Hollings testified that he was typically very proactive in issuing tickets and "making cases" but that he desired to take a break from doing so for a period of time. He then testified that during the ongoing phone conversation on the night in question, he and Sergeant Dutton were talking about making traffic stops. Officer Hollings then stated that he told Sergeant Dutton that an approaching vehicle (which it is now known was driven by Weaver) was traveling slower than other traffic on the road that night and appeared to be a "good car." According to Officer Hollings, after he relayed this information to Sergeant Dutton, Sergeant Dutton said to Officer Hollings: "go after him."

On cross-examination, Officer Hollings admitted that he had not previously told anybody about the ongoing phone conversation with Sergeant Dutton, and he likewise admitted that he did not mention it during his previous testimony at either the initial suppression hearing or trial.

The Court finds Officer Hollings' failure to reference this ongoing conversation concerning—particularly considering the substance of the conversation.

Officer Hollings testified that it was he who said "tag lights" at the 0:16 mark of the video.[5] When asked about the purpose of saying it, Officer Hollings said that he was "just stating what I

---

[5] To be clear, when referring to specific times in the dash cam video, the Court's reference is to the "long video."

see to stop him." He testified that he was not sure if he was still on the phone with Sergeant Dutton at that time or if he was simply stating out loud what he saw. The Court notes, though, that Officer Hollings' vehicle was still a significant distance behind Weaver's vehicle at this point in the video. In fact, Officer Hollings himself admitted that he was "probably 100, 200 feet" away from Weaver's vehicle at that time. Although certainly not in and of itself dispositive, the Court notes that, as emphasized at the hearing, a tag light need only be readable from a distance of 50 feet to comply with Mississippi law. *See* MISS. CODE ANN. § 63-7-13(3).

Officer Hollings' indication that he confirmed the basis for the stop when he was admittedly "100, 200 feet" away from Weaver causes this Court concern.

Another point of contention concerns the timing of Sergeant Dutton's arrival on the scene after Officer Hollings initiated the traffic stop. At the most recent hearing, Officer Hollings testified that he did not have to call Sergeant Dutton to the scene because he was already on his way—presumably because of their ongoing conversation. Defense counsel then walked through Officer Hollings' trial testimony on this point. At trial, Officer Hollings testified as follows:

> Q.   All right. So what did you do after conversing with Mr. Weaver and observing the marijuana there in the front of the car?
>
> A.   I pointed it out to him, and I asked him if that's all he had. And he said, "Yes, sir, it was." So I just set it on top of the car, and I -- I went back to my patrol car to run his driver's license.
>
> Q.   Okay. Did anything of any interest come back from the driver's license?
>
> A.   No, sir, not that I remember.
>
> Q.   What did you do next?
>
> A.   *That's when I called for my backup unit*. He arrived, and I advised him that I found marijuana in the vehicle; so we were

> going to have Mr. Weaver step out so I could search the
> vehicle.

[133] at p. 166 (emphasis added).

At the most recent hearing, Officer Hollings said that he "was mistaken" on this point during his trial testimony.

Back to Officer Hollings' trial testimony. At another point during trial, he testified as follows:

> Q.    . . . Why call Sergeant Dutton for backup with a tag light
>        out?
>
> A.    *I called him after I located narcotics in the vehicle* because
>        I knew I was going to have to search the vehicle, and you
>        always do that with a pair.

[133] at p. 195-96 (emphasis added).

At the most recent hearing, Officer Hollings testified that this trial testimony was not true and that he was "mistaken on another situation."

At yet another point during the trial, Officer Hollings testified about the sequence of events regarding Sergeant Dutton's arrival:

> Q.    Okay. So you approach the car. You see marijuana. You grab
>        it. You pull it out. You put it on the top. You call for backup.
>        Then you tell Dutton what you found; right? That's the chain
>        of events; right?
>
> A.    Yes, sir.

[133] at p. 197.

Officer Hollings again admitted that he was mistaken.

"The judge's role at a suppression hearing is to determine the credibility of witnesses and find the facts. At a suppression hearing, it is well within the trial court's discretion to weigh the evidence and make credibility determinations regarding conflicting testimony." *United States v.*

*Jones*, 187 F. Supp. 3d 714, 723 (M.D. La. 2016) (citing *United States v. Jones*, 2012 WL 1309837, at *7 (S.D. Tex. Apr. 16, 2012); quoting *Norman v. Stephens*, 2013 WL 6498979, at *21 (S.D. Tex. Dec. 11, 2013)) (internal quotation marks omitted).

Stated simply, this Court does not find Officer Hollings credible. As indicated above, his failure to in any way reference—at the first suppression hearing or at trial—an ongoing conversation with Sergeant Dutton gives the Court pause. It is particularly concerning when considered in conjunction with the fact that during his trial testimony he testified three different times that he called Dutton *after* locating narcotics in Weaver's vehicle. His testimony at the most recent hearing was in direct contradiction to that point, and he only admitted the discrepancy after reviewing the trial transcript.

Furthermore, the Court cannot overlook the fact that a supervisor told Officer Hollings to "go after him." Although Officer Hollings (and Sergeant Dutton) provided testimony in an attempt to explain that statement, the Court, given the significant discrepancies outlined herein, does not give much weight to that explanation. Notably, neither Officer Hollings nor Sergeant Dutton took a photo of the inoperable tag light, despite the fact that Officer Hollings specifically testified at the initial suppression hearing that he typically did so. *See* [131] at p. 28. The failure to comply with the standard procedure is concerning.

Lastly, the Court notes that when Officer Hollings verbally stated "tag lights," he admits he was "probably 100, 200 feet" away from Weaver's vehicle. The Court certainly questions whether Officer Hollings was able to verify that the tag light was inoperable from that distance.

Ultimately, as noted above, reasonable suspicion is based on the totality of the circumstances. The Court, considering all of these circumstances surrounding the traffic stop

including the discrepancies outlined above, finds that the Government cannot show that the traffic stop was justified at its inception.

In reaching this conclusion, the Court feels compelled to address an issue that could at first blush appear to be an error in analysis. The Court is cognizant that reasonable suspicion is an objective—not subjective—standard. *See United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022) ("Reasonable suspicion is a low threshold, requiring only a minimal level of *objective* justification.") (emphasis added; citations and quotation marks omitted). The Court is likewise aware that the fact that a traffic stop might be pretextual does not necessarily render it invalid from a Fourth Amendment perspective—so long as there was an objective basis for the stop. *See*, *e.g.*, *Lopez-Moreno*, 420 F.3d at 432 ("So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment[.]") (citations omitted).

Since it is reconsidering the suppression issue largely based upon Officer Hollings' testimony, the Court clarifies that the conclusion is not simply a determination that the stop was pretextual, as such a finding alone would be an improper basis for suppression under the applicable law. Rather, the Court's decision is based upon the fact that it does not find Officer Hollings credible due to the significant discrepancies in his testimony (articulated above). The dash cam video itself is, in this Court's view, inconclusive. And because the Court does not find Officer Hollings' testimony credible, it cannot, and does not, find that there was reasonable suspicion to justify the traffic stop.

Weaver is entitled to a new trial on Count Two. His conviction on that Count is hereby VACATED. The traffic stop was invalid, and all evidence seized thereafter, including but not limited to the firearm, is hereby suppressed as it pertains to Count Two.

The Court notes that there was some discussion at the most recent hearing regarding the effect that such a ruling might have on the Government's case as to Count Two. Whether or not the Government ultimately decides to proceed on that Count is a decision for the Government— not this Court. For purposes of the present ruling, Weaver's request for a new trial as to Count Two is granted.

II.      *Count One*

In addition to the arguments addressed above in connection with Count Two, Weaver seeks dismissal of Count One. In simple terms, Weaver contends that the Government knowingly presented false evidence to the grand jury.

In his *pro se* Motion [107] filed on June 27, 2023, Weaver expends considerable time pointing to testimony that he contends was false. At the August 1, 2023 hearing, this Court advised Weaver that his arguments in connection with Count One needed to be better articulated. After being appointed to represent Weaver, defense counsel filed a Memorandum of Authorities [139] to support Weaver's *pro se* Motion [107]. In the Memorandum [139], counsel indicates that he "is of the opinion that the only issue in need of better articulation has to do with the grand jury testimony of Postal Inspector Charlie Tutor." [139] at p. 1-2.

A.      *Standard*

"As a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant." *United States v. Cessa*, 861 F.3d 121, 141 (5th Cir. 2017) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254, 108 S. Ct.

2369, 101 L. Ed. 2d 228 (1998)). "Dismissal of the indictment is appropriate *only if* it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Id.* (citations and quotation internal marks omitted; emphasis added). Importantly, the Fifth Circuit has "refuse[d] to adopt the proposition that, absent perjury or government misconduct, an indictment is flawed simply because it is based on testimony that later may prove to be questionable." *United States v. Sullivan*, 578 F.2d 121, 124 (5th Cir. 1978).

      *B.    Application*

      Weaver's first contention concerns Tutor's grand jury testimony as it pertains to Ben Jones' version of events. During the grand jury proceeding, Tutor testified that a black male initially got out of the vehicle and confronted Jones and later drove by again with two other males in the vehicle.

      Weaver takes issue with this testimony and raises the following argument:

> On the day of the incident (April 23, 2022), Jones initially told law enforcement that all three occupants got out of the vehicle with masks and weapons. (Quitman County Sheriff's Depart. Incident Report, Exh. B). Three days later (April 26, 2022), Jones stated in his written statement to the Marks Police Dept. that three persons were always in the vehicle, and allegedly Weaver was the only person to get out. (Jones statement to Marks Police Dept, Exh. C). Thus, Tutor related information contradicted by the statements of Jones that were created before Tutor testified.

[139] at p. 3.

      This argument is a non-starter. It appears to the Court that Weaver's issue is with potentially inconsistent statements that *Jones* provided—not Tutor. Jones testified at trial, at which time Weaver was able to cross-examine him before the jury. The Court does not see Tutor's grand jury testimony on this issue as problematic.

16

Weaver also takes issue with the fact that Tutor testified during the grand jury proceeding that Jones did not know Weaver by name—only by his nickname. However, the incident report created on the date of the alleged incident lists Weaver's name. In addition, Weaver emphasizes that Tutor advised the grand jury that Jones called the police and went back to the post office after the incident, whereas the 911 call was actually made by Jones' supervisor. Additionally, Jones testified at trial that he finished his route instead of going back to the post office. Also, Weaver notes that Tutor testified before the grand jury that the assailant gave Jones 24 hours to produce the package; however, the incident report indicates that the assailant gave Jones until Monday (the alleged incident happened on a Saturday). Tutor also testified that Jones was moved out of the Marks, Mississippi area for his safety, whereas Jones testified at trial that his route was switched to a route in Drew, Mississippi simply to carry mail for another postal worker who missed work.

None of these allegations are sufficient to warrant the extraordinary relief that Weaver now requests. As indicated above, the Fifth Circuit has declined to find that an indictment is inherently flawed because it is based on testimony that later proves to be questionable. *See Sullivan*, 578 F.2d at 124. The Court does not necessarily find Tutor's testimony to be "questionable" but, given the substantial latitude in this particular area of the law, the Court sees no need to delve further into these issues. *See id*. ("Such a rule of law would necessitate independent judicial review of the credibility of grand jury witnesses, an exercise that would seriously infringe upon the traditional independence of the grand jury.") (citation omitted). Weaver's arguments on these points are rejected.

Another point of contention with Tutor's testimony concerns Jones' identification of the other occupants of the vehicle. Tutor testified before the grand jury that Jones' cousin identified a second person in the vehicle, but Tutor did not state the name of that person. Weaver argues:

> Jones's statement to the Marks Police Depart. On April 26, 2022
> identified "Redd" (Roderick Turner) as another person in the car.
> (Exh. C, p. 3). However, this person was not disclosed to the grand
> jury and no indictment was sought of him. This is important because
> the grand jury surely would have questioned why Turner was not
> indicted along-side Weaver for allegedly doing the same act. This is
> particularly true in light of the fact that a grand juror pointed out that
> this was a "he said-he said" situation without any physical evidence
> supporting Jones's story. (Exh. A., pp. 7-9). Which led to the
> government telling the grand jury to the effect (but not word for
> word): "Well, we know it is just Jones's word, but this is the kind of
> stuff that Weaver does."

[139] at p. 3-4.

Again, Weaver's contentions fall short. He raises speculation as to what the grand jury
might have decided to do if Tutor had provided Turner's name to the grand jury. This is a far cry
from the applicable standard necessary to warrant dismissal of an indictment. *See Sullivan*, 578
F.2d at 124.

Lastly, Weaver alleges that Tutor injected prejudicial information into the grand jury
proceeding when he was called upon to speculate that the event was essentially based upon a
mailed package containing drugs. Similarly, Weaver argues that the Government "injected issues
concerning Weaver's character and propensity for committing crimes like this: 'I talked to County
[law enforcement and] they said everything matched up with what the carrier is saying as far as
how this guy operates . . . They said they continuously have issues with him.'" [139] at p. 4.

Weaver takes the position that these issues were improperly injected into the grand jury
proceeding, warranting dismissal of the indictment. As indicated above, "[d]ismissal of the
indictment is appropriate *only if* it is established that the violation substantially influenced the
grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from
the substantial influence of such violations." *Cessa*, 861 F.3d at 141 (citations and internal
quotation marks omitted; emphasis added). Even assuming that the testimony constituted a

violation of Weaver's rights—a finding this Court does not make—it would not justify dismissal of the charge. The grand jury was made aware of the underlying facts, as well as the fact that it was a "he said-he said" type of case, yet still chose to indict Weaver. Having reviewed the transcript attached to Weaver's Memorandum [139], the Court is not left with "grave doubt that the decision to indict was free from the substantial influence of such violations." *Cessa*, 861 F.3d at 141.

Weaver's request for dismissal of Count One is denied.

### III.     Procedural Posture

Despite rejecting Weaver's arguments as to dismissal of Count One, the Court notes that he is nevertheless entitled to *some* relief on that Count.

Because the two Counts were tried jointly, evidence of the January 12, 2022 traffic stop was (necessarily) introduced into evidence. However, considering the Court's ruling today, the evidence should have been suppressed at the outset. The Court cannot help but note the significant prejudicial effect of the introduction of the dash cam video and Sergeant Dutton's body cam video. The videos showed Weaver fleeing on foot from law enforcement and a firearm recovered from inside his pants. Additionally, the body cam video showed Weaver being escorted from the wooded area in handcuffs. The prejudicial effect of the introduction of this evidence cannot be ignored. And the Court finds that its improper introduction, in addition to warranting a new trial on Count Two, also justifies a new trial on Count One. *See United States v. Tarango*, 396 F.3d 666, 671-72 (5th Cir. 2005) ("Granting a motion for a new trial pursuant to Rule 33 is permissible if it is necessitated by the interests of justice."). The Court finds that the interests of justice warrant granting the exceptional relief of a new trial.

Therefore, as with Count Two, Weaver's conviction on Count One is hereby VACATED.

*Conclusion*

For the reasons set forth above, Weaver is entitled to a new trial. Both convictions are VACATED. The case will be placed back on the Court's active trial docket. A separate Order setting the trial and applicable deadlines will issue this day.

The Court has in some form or fashion addressed all arguments—raised across numerous filings—that it deems relevant. Weaver filed many of the pending Motions in a *pro se* capacity, and many of them address numerous issues and request relief that overlap with relief sought in other filings. In light of today's ruling, the Court finds it most appropriate to simply terminate all pending Motions. All pending Motions are hereby TERMINATED.

SO ORDERED, this the 5th day of January, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE